**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LADEAN DANIELS, | ) | 3:23-CV-00441 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOCTOR FEDER, *et al.*, | ) | |
| *Defendants*. | ) | March 16, 2026 |

## <u>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Sarala V. Nagala, United States District Judge.

Plaintiff LaDean Daniels brings this action *pro se* under 42 U.S.C. § 1983, alleging certain prison officials acted with deliberate indifference to his serious medical condition. *See* Compl., ECF No. 1, at 7, 9-11. These officials—Defendants Dr. Ingrid Feder and Nurses Yvonne Marceau, Jillian Bellman, and Kristen Fernandez—worked at Corrigan Correctional Center ("Corrigan"), where Plaintiff was housed during the relevant time. Defs.' L.R. 56(a)1 St. of Material Facts, ECF No. 84-2, ¶¶ 7, 9. Defendants have moved for summary judgment on Plaintiff's deliberate indifference claims, Mot. for Summ. J., ECF No. 84. Plaintiff opposes Defendants' motion. Pl.'s Opp'n to Mot. for Summ. J., ECF No. 89.

For the following reasons, Defendants' Motion for Summary Judgment, ECF No. 84, is **GRANTED**.

## I.    BACKGROUND

The following facts, drawn from Defendants' Local Rule 56(a)1 statement, ECF No. 84-2, and supporting exhibits, ECF No. 84-3 through 84-9, are undisputed except as otherwise noted.[1]

### A.  Plaintiff's Custody Status

Plaintiff was sentenced on April 4, 2017, and ordered to serve a three-year term of imprisonment, to be followed by a seven-year term of special parole.  ECF No. 84-2 ¶ 2.  "Special parole is an additional period of supervision that begins after the expiration of an inmate's term of imprisonment."  *Walker v. Doe 1*, No. 3:23-CV-1469 (SVN), 2024 WL 406299, at *1 n.1 (D. Conn. Feb. 2, 2024); *see also* Conn. Gen. Stat. § 54-125e.  The Department of Correction "is responsible for supervising individuals during their terms of special parole, and the parolees may be reimprisoned for violations of conditions of special parole."  *Walker*, 2024 WL 406299, at *1 n.1; *see also* Conn. Gen. Stat. §§ 54-125e and 54-126 (describing special parole and consequences of violation).  Plaintiff was released to special parole supervision on September 21, 2018.  ECF No. 84-2 ¶ 3.  On May 14, 2020, Plaintiff was admitted to Corrigan for a violation of the conditions of his special parole, pending proceedings before the Board of Pardons and Paroles.  *Id.* ¶ 4.

---

[1] Local Rule 56(a)1 requires a party moving for summary judgment to file "a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)1.  Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 statement, containing separately numbered paragraphs corresponding to the Local Rule 56(a)1 statement and indicating whether the opposing party admits or denies the facts set forth by the moving party.  D. Conn. L. Civ. R. 56(a)2.  Each denial must include a specific citation to an affidavit or other admissible evidence.  D. Conn. L. Civ. R. 56(a)3.

Defendants informed Plaintiff of this requirement.  *See* ECF No. 84-9 ("Notice to Self-Represented Litigant Concerning Motion for Summary Judgment as Required by Local Rule of Civil Procedure 56(b)").  Despite receiving notification of this requirement, Plaintiff did not submit a Local Rule 56(a)2 statement, though he references such a statement once in his opposition to Defendants' summary judgment motion.  *See* ECF No. 89-1 at 1.

That Plaintiff is unrepresented does not excuse him from complying with the Court's procedural and substantive rules.  *See Treistman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006).  Thus, the facts contained in Defendants' Local Rule 56(a)1 statement, where supported by evidence of record, are deemed admitted.  *See* D. Conn. L. Civ. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions[.]").

Between May 14, 2020, and August 11, 2020—the relevant time period for this action—Plaintiff was a convicted and sentenced individual, serving a sentence of special parole in the custody of the Department of Correction pending a determination as to whether he violated his conditions of special parole. Defs.' Ex. A, Decl. of Michelle DeVeau, ECF No. 84-3, ¶ 11.

B. Plaintiff's Medical Conditions and Relevant Events at Corrigan

Plaintiff suffers from an Equinus deformity in his right foot. ECF No. 84-2 ¶ 23. Equinus is a "condition in which the upward bending motion of the ankle joint is limited." *Id.* ¶ 25. Plaintiff also experiences chronic back pain. *Id.* ¶ 23. As detailed below, while detained at Corrigan, Plaintiff developed cellulitis, which is a common and sometimes serious skin infection, and an abscess on his right foot, leading to his hospitalization. *Id.* ¶¶ 24, 27, 71.

On May 14, 2020, Plaintiff arrived at Corrigan in an agitated state, at which point Defendant Bellman began a physical examination of his person. *Id.* ¶¶ 30–31. Plaintiff presented with a limp, but Bellman noticed no outward abrasions or signs of infection on Plaintiff's right foot. *Id.* ¶ 31.

That same day, prison officials placed Plaintiff in the Corrigan infirmary on a "custody hold" to monitor his perceived behavioral issues; while in the infirmary, Plaintiff used a wheelchair for long-distance travel. *Id.* ¶¶ 33–36. By May 16, 2020, Plaintiff was walking with a walker to assist his mobility. *Id.* ¶ 39. By May 17, 2020, Plaintiff had not showered for several days and developed a rash on his groin. *Id.* ¶ 40. A nurse examined his right lower extremity, and that nurse observed no signs of infection. *Id.* ¶ 41.

The next day—May 18, 2020—Defendant Dr. Feder reviewed Plaintiff's medical chart (without meeting with Plaintiff) and determined that Plaintiff did not need an assigned wheelchair; instead, the walker would suit his needs. *Id.* ¶ 42; Defs.' Ex. B, Decl. of Ingrid Feder, M.D., ECF

3

No. 84-4, ¶ 28 (attesting that she reviewed Plaintiff's medical chart without interacting with Plaintiff).

On May 22, 2020, Plaintiff exhibited recalcitrant behavior, including yelling at staff, throwing his walker, and threatening to hurt himself and others. ECF No. 84-2 ¶ 43. Prison officials placed Plaintiff on Behavioral Observation Status ("BOS"), which limited his access to personal effects, personal clothing, and shoes. *Id.* ¶¶ 44–45. Plaintiff was dressed in a Ferguson gown, a one-piece garment "generally used to prevent a hospitalized, incarcerated, or otherwise detained individual from engaging in self-harm, damage to property, or damage to others." *Id.* ¶ 46. While Plaintiff was in BOS, prison officials removed Plaintiff's access to both the wheelchair and the walker. *Id.* ¶ 47.

The following day, Bellman saw Plaintiff in the infirmary to assist Plaintiff with his complaint about pain in his right foot. *Id.* ¶ 49. On examination, Bellman saw that the "skin integrity in his right foot was altered." *Id.* She did not, however, observe any visible signs of infection or an open wound. *Id.* Bellman noted those observations in Plaintiff's medical chart and indicated that medical staff should monitor his right foot. *Id.* ¶ 50.

On May 24, 2020, another nurse met with Plaintiff and observed a small cut under a toe on his right foot. *Id.* ¶ 51. Plaintiff told the nurse that he had soaked his foot in the toilet, and the nurse advised against that behavior due to the increased risk of infection. *Id.* Bellman saw Plaintiff in the infirmary and administered Acetaminophen for his pain. *Id.* ¶ 52.

On May 25, 2020, Bellman observed Plaintiff laying on the floor in the infirmary, which she determined to be behavioral in nature rather than related to a medical need. *Id.* ¶ 53. Plaintiff did not mention his foot to Bellman during this encounter. *Id.* Plaintiff was moved that day to the Restricted Housing Unit ("RHU"), though he remained on BOS. *Id.* ¶ 54.

Defendant Fernandez met with Plaintiff to evaluate him after his move. *Id.* ¶ 55. Fernandez observed Plaintiff's right foot to be dry and swollen with some cracking in the skin. *Id.* ¶ 56. Fernandez took Plaintiff's vitals, cleansed his foot with saline, and applied bacitracin to the cracks. *Id.* Fernandez did not observe any signs that Plaintiff had an infection but noted these developments in Plaintiff's chart so they could be monitored. *Id.* ¶ 56–57. She did not provide Plaintiff with additional non-prescription pain medication, as he was already taking acetaminophen and Lyrica. *Id.* ¶ 57. Defendant Marceau does not recall interacting with Plaintiff on that day. *Id.* ¶ 58.

On May 26, 2020, prison officials terminated Plaintiff's BOS status and use of the Ferguson gown. *Id.* ¶ 59. The following day, Fernandez visited Plaintiff's housing unit and Plaintiff showed her his foot. *Id.* ¶ 60. Fernandez informed Plaintiff's providers that Plaintiff's foot required care because it appeared noticeably worse. *Id.* An APRN thereafter assessed Plaintiff's foot, which appeared swollen and discolored with a maceration near his first and second metatarsal. *Id.* ¶ 61. That APRN determined that Plaintiff had an abscess and infection in his right foot. *Id.* She prescribed Plaintiff an oral antibiotic and ordered him an ankle brace and an x-ray. *Id.* Plaintiff then had an x-ray, and Fernandez took his vitals, which revealed no fever. *Id.* ¶ 62.

The same day (May 27, 2020), Plaintiff met with the Warden and the APRN to discuss Plaintiff's request for specific footwear (Air Force Ones) to address his disability. *Id.* ¶ 63. Plaintiff's request was denied because it was determined that footwear would worsen his condition, and that shoes similar to those he had requested were available in the commissary. *Id.*

Later that day, Bellman tended to Plaintiff's right foot, which she observed as lightly bleeding from cracked skin between the toes. *Id.* ¶ 64. Bellman cleaned the skin, provided antibiotic ointment, and bandaged it, while also noting in Plaintiff's chart that a provider should

examine his foot.  *Id.*  On either May 27 or 28, Bellman gave Plaintiff the ankle brace that had been ordered for him; during that encounter, Plaintiff did not raise concerns about pain in his foot. *Id.* ¶ 65.

On May 29, 2020, a nurse observed that the condition of Plaintiff's right foot appeared to be deteriorating, with signs of an infection, and a non-party doctor admitted Plaintiff to the infirmary for cellulitis and an abscess in the right foot.  *Id.* ¶ 66.  In the infirmary, Bellman tended to Plaintiff's wounds in his right foot, administered intravenous antibiotics, and gave Plaintiff acetaminophen, based on the doctor's orders.  *Id.* ¶ 67.  In the infirmary, Plaintiff had a walker, which he kept until his transfer to a different facility on August 11, 2020.  *Id.* ¶ 68.  The same day, Marceau filled out a medical incident report concerning Plaintiff's examination for a wound assessment, based on information provided by a separate medical professional.  *Id.* ¶ 69.

On June 1, 2020, Plaintiff met with a nurse in his cell, and that nurse informed Plaintiff that he should avoid soaking his foot in his toilet because it increased the risk of infection.  *Id.* ¶ 70.  Plaintiff informed her that he only did this once.  *Id.*  Later that day, an APRN sent Plaintiff to the emergency department at the University of Connecticut ("UConn") hospital because of increasing concerns that Plaintiff's abscess and cellulitis could worsen.  *Id.* ¶ 71.  The next day, Plaintiff had an MRI that confirmed the presence of an abscess and cellulitis.  *Id.* ¶ 72.  His abscess was drained on June 3, 2020.  *Id.* ¶ 73.  Hospital employees also surgically removed infected tissue from the area.  *Id.*

On June 4, 2020, Plaintiff was discharged from UConn to the Corrigan infirmary.  *Id.* ¶ 75. His post-operative instructions included remaining "non-weightbearing" on his right leg through use of the walker and wheelchair, continuing his antibiotic treatment for fourteen days, changing his bandages every other day, and following up with podiatry.  *Id.* ¶ 76; *see also* Defs.' Ex. F, ECF

No. 82 at 190–91.  On June 5, 2020, Dr. Feder reviewed Plaintiff's chart without meeting or speaking with Plaintiff, and she ordered the post-surgical treatment prescribed by the UConn surgeon.  ECF No. 84-2 ¶ 77.

On June 6, 2020, Marceau tended to Plaintiff's right foot, including taking Plaintiff's vitals, removing the bandages, cleaning the wound, and rebandaging it.  *Id.* ¶ 78.  Plaintiff reported having mild intermittent pain.  *Id.*  Marceau saw Plaintiff again the next day, taking his vitals and referring him to nurse sick call for reported acid reflux.  *Id.* ¶ 79.  On June 8, 2020, Plaintiff had a post-operative telemedicine appointment with his UConn surgeon, who recommended proceeding with the previously-assigned post-operative care.  *Id.* ¶ 80.

On June 9, 2020, Plaintiff wrote to Dr. Feder about his request for sneakers, and a nurse answered the message.  *Id.* ¶ 81.  Dr. Feder attests that she did not speak with either the Warden or with Plaintiff about Plaintiff's footwear at any point between May 14, 2020, and June 17, 2020. *Id.* ¶ 119; Feder Decl., ¶ 39.

On June 10, 2020, Bellman tended to Plaintiff's wound, including taking his vitals, cleansing the wound, and changing the bandages.  ECF No. 84-2 ¶ 82.  On June 12, 2020, Bellman went to Plaintiff's cell in response to a report that Plaintiff's walker was broken.  *Id.* ¶ 83.  She took Plaintiff's vitals and replaced his walker.  *Id.*  The next day, Fernandez tended to Plaintiff's wound; there were no signs that it was worsening.  *Id.* ¶ 84.  That same day, Bellman added Plaintiff to the sick call list after receiving an inmate request in which Plaintiff complained of pain in his hip and lower back.  *Id.* ¶ 85.

On June 14, 2020, Fernandez saw Plaintiff to inspect his wound and change his bandages. *Id.* ¶ 86.  She observed no signs of a worsening condition.  *Id.*

On June 17, 2020, Dr. Feder saw Plaintiff when Plaintiff went to the infirmary to shower. *Id.* ¶ 87.   Plaintiff informed Dr. Feder that he was experiencing increased pain, and she changed his pain medication to address that pain, including by increasing his dosage of Percocet (an opioid for pain) and adding Gabapentin (a non-opioid medication). *Id.*  Plaintiff also informed Dr. Feder that the Warden had allowed Plaintiff to purchase sneakers from the commissary, but Plaintiff did not request Dr. Feder's assistance with purchasing the sneakers. *Id.* ¶ 88. Dr. Feder reports that this is the first time Plaintiff spoke with Dr. Feder about his footwear. *Id.* ¶ 120.

On June 21, 2020, Marceau tended to Plaintiff's wounds with the usual protocol, and Plaintiff reported he was not experiencing pain. *Id.* ¶ 89.  The next day, Dr. Feder continued to adjust Plaintiff's pain medications as necessary. *Id.* ¶ 90.

On June 26, 2020, Dr. Feder evaluated Plaintiff in the infirmary, and Dr. Feder viewed Plaintiff's wound as having re-opened and appearing discolored. *Id.* ¶ 91.  Dr. Feder suspected a worsening infection and transferred Plaintiff to the emergency department at UConn hospital. *Id.* There, Plaintiff was evaluated, but did not require further surgical removal of tissue; Plaintiff returned to the infirmary at Corrigan that evening. *Id.* ¶ 92.  The emergency department recommended seven additional days of antibiotic treatment and continued bandage changings, but allowed Plaintiff to put weight on his right foot as he found tolerable. *Id.*

On June 28, 2020, Fernandez tended to Plaintiff's wound, and she noted that Plaintiff's right foot appeared less swollen. *Id.* ¶ 93.  The next day, Plaintiff had another post-operative telemedicine appointment with his UConn. surgeon, which resulted in the added recommendation of a large post-operative shoe or boot to aid with healing. *Id.* ¶ 94.  That day, Plaintiff was provided an open-toed diabetic shoe. *Id.* ¶ 95; *see also* ECF No. 82 at 97, 100.

On June 30, 2020, Plaintiff was given access to a wheelchair. *Id.* ¶ 96. Dr. Feder continued to monitor Plaintiff's pain medication before decreasing it on July 6, 2020. *Id.* ¶¶ 97, 99; ECF No. 82 at 75. Fernandez tended to Plaintiff's wound on July 6 and 8, 2020. ECF No. 84-2 ¶¶ 98, 100. Fernandez found no evidence of the condition of Plaintiff's foot worsening or of infection on those dates. *Id.*

Dr. Feder met with Plaintiff on July 10, 2020, to discuss Plaintiff's noted back pain and the infection in his right foot. *Id.* ¶ 101. During this meeting, Plaintiff told Dr. Feder that the pain prevented him from standing for long periods of time, and he would sit on his walker. *Id.* Plaintiff asked Dr. Feder to help him get new sneakers from the commissary, and Dr. Feder issued him a sneaker pass to purchase sneakers through the commissary (but from an outside vendor) for added protection. *Id.* ¶ 102. Dr. Feder issued the sneaker pass, but Plaintiff would not be able to wear any new sneakers until his wound had fully healed, to prevent it from breaking open again. *Id.* ¶ 103. Dr. Feder allowed Plaintiff to have the sneaker pass because having custom footwear made by an outside orthotics and prosthetics vendor would likely take a significant amount of time, especially with COVID-19 restrictions. *Id.* ¶ 102. Dr. Feder also issued Plaintiff a bottom bunk pass, ordered him a rolling walker with a seat, issued him a pass allowing him to sit on his current walker until the new one arrived, ordered a back brace and a right ankle brace, and prescribed pain medication. *Id.* ¶ 104.

On July 19, 2020, and August 2, 2020, Marceau tended to Plaintiff's wound, and Plaintiff reported no pain. *Id.* ¶¶ 105, 107. The wound was fully closed as of the latter of these visits. *Id.* ¶ 108. In between these appointments, Plaintiff requested, on July 30, 2020, that Dr. Feder put him on a list for a podiatry consultation because his wound had closed. *Id.* ¶ 106. He requested that he be fitted for lifts for his shoes and scheduled to have his toenails cut and fungus addressed.

*Id.* Dr. Feder responded the next day to say "we" would start working on this, meaning that he would be placed on a list to be seen by a podiatrist. *Id.* As the request for the custom orthotics was already in process, there was no need to duplicate this request. *Id.*

On August 3, 2020, Dr. Feder (without seeing Plaintiff) discontinued Plaintiff's use of oxycodone because his wound was deemed fully closed. *Id.* ¶¶ 107–09. The next day, Plaintiff requested that Dr. Feder renew Plaintiff's oxycodone prescription to address his back and hip pain. *Id.* ¶ 110. In response, Dr. Feder increased Plaintiff's dosage of Gabapentin, so that he could continue to be tapered off opioid medications. *Id.* ¶ 111. Plaintiff also informed Dr. Feder that he was having trouble getting his new sneakers out of commissary (despite that they had arrived), and Dr. Feder asked the nurse manager to speak to custody staff about the sneakers. *Id.* ¶¶ 110–12; ECF No. 84-4 ¶ 69.

Marceau and Bellman assessed Plaintiff's right foot for signs of infection on August 7 and 10, 2020, respectively, and each confirmed there was no sign of infection and that the wound remained closed. ECF No. 84-2 ¶¶ 113–14.

C. Procedural History

Plaintiff filed his complaint in this action on April 6, 2023. *See generally* ECF No. 1. On initial review, the Court allowed Plaintiff's claims of deliberate indifference to proceed against these Defendants in their individual capacities for damages. Initial Review Order, ECF No. 22 at 15. The Court also allowed Plaintiff to proceed on his claims under the Americans with Disabilities Act ("ADA") against Dr. Feder and the Warden. *Id.*

Later, on Dr. Feder and Warden Martin's motion, the Court dismissed all claims against the Warden, Plaintiff's ADA claim against Dr. Feder, and Plaintiff's deliberate indifference claim against Dr. Feder related to her treatment of Plaintiff's abscess. *See* Order on Mot. to Dismiss,

10

ECF No. 74 at 1–2, 8, 9.  Thus, Plaintiff's only remaining claim against Dr. Feder stems from the alleged deliberate indifference concerning the delay of special footwear.  *Id.* at 11.  Marceau, Bellman, and Fernandez did not move to dismiss, and Plaintiff's claims against them relate to what he describes as inadequate medical treatment of his abscess.  *See* ECF No. 22 at 9.

All remaining Defendants have moved for summary judgment, arguing that the undisputed facts demonstrate that none of them violated Plaintiff's Eighth Amendment rights and that, even if a constitutional violation occurred, they are entitled to qualified immunity.  *See* ECF No. 84 at 1.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might "affect the outcome of the [law]suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'"  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001).  "It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

To defeat summary judgment, the non-moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S. at 249.  When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citation and quotation marks omitted).  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323; s*ee PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*).

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (internal

citation and quotation marks omitted).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Moreover, the Court bears in mind that a *pro se* litigant's filings must be liberally construed to raise the strongest arguments they suggest.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se* litigants).

## III.    DISCUSSION

The undisputed evidence in the record demonstrates that no Defendant is liable for a violation of Plaintiff's Eighth Amendment rights.

Plaintiff asserts that Dr. Feder unlawfully delayed Plaintiff's access to specialty footwear, leading to Plaintiff developing an infection.  Further, he asserts that Defendants Marceau, Bellman, and Fernandez rendered constitutionally deficient treatment of that infection.  In Plaintiff's opposition, he clarifies that his claims are limited to the care he received from May 14, 2020, to June 1, 2020, before his hospitalization.  *See* ECF No. 89-1 at 2; *id.* at 15 ("No one is questioning the care the Plaintiff received after June 1st[,] 2020.").  With that understanding, the Court addresses Plaintiff's deliberate indifference claims as to each Defendant below.

### A.  Deliberate Indifference

Because Plaintiff was serving his sentence of special parole at the relevant time, his deliberate indifference claims are analyzed under the Eighth Amendment.  *See Walker*, 2024 WL 406299, at *4–5.  That Plaintiff was at the time detained for a suspected violation of his special parole conditions does not change that conclusion because he was post-conviction in either scenario.  *See Shabazz v. Sharr*, No. 3:19-CV-1233 (VLB), 2020 WL 646171, at *3 (D. Conn. Feb.

11, 2020) ("[P]ersons on special parole remain under the custody of the Department of Correction and, therefore, [the plaintiff's] claims are cognizable under the Eighth, not the Fourteenth, Amendment.").[2]

Under the Eighth Amendment, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Showing deliberate indifference to medical needs requires proving both an objective and subjective component. *See id.*

### 1. Objective Component

The objective component requires Plaintiff to demonstrate a "'*serious* illness or injury' resulting in the infliction of unnecessary pain and suffering." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quoting *Estelle*, 429 U.S. at 105) (emphasis in original). "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Id.* at 185 (quoting *Chance*, 143 F.3d at 702) (emphasis in original).

First, there appears to be no dispute that a delay in treatment of an abscess is sufficiently serious; as discussed, the pain that Plaintiff experienced as his infection worsened is well supported in the record. *See Chance*, 143 F.3d at 703 (considering extreme pain in evaluating seriousness).

---

[2] On initial review and in evaluating Dr. Feder and the Warden's motion to dismiss, the Court analyzed Plaintiff's claims under the Fourteenth Amendment because it understood Plaintiff to be an unsentenced inmate. It is only now that Defendants submit information to show that Plaintiff was a sentenced inmate serving a period of special parole and in custody pending a determination of whether he violated his conditions of special parole during the period between May 2020 and August 2020. *See* ECF No. 84-2 ¶¶ 2–8; ECF No. 84-3 ¶¶ 6–11.

Thus, this element is satisfied with respect to Plaintiff's claims against Marceau, Bellman, and Fernandez.

Second, as to Plaintiff's claim against Dr. Feder about the delay in specialty footwear, Plaintiff maintains that the delay was sufficiently serious in that it required him to walk on the front of his foot, led to an infection in his tissue requiring hospitalization, and could have led to an infection in his bones requiring amputation. ECF No. 89-1 at 7–8. Defendants respond that no record evidence shows that a delay in specialty footwear led to the development of an abscess, and Plaintiff's argument is otherwise speculative. ECF No. 84-1 at 12–13. This is especially true, they argue, where Plaintiff had access to a walker and wheelchair. *Id.* at 14; ECF No. 84-2 ¶ 123.

Still, the Court is satisfied that, on this record, a jury could find that a delay in providing Plaintiff's specialty footwear led to the development of an infection. The record supports that, during his hospitalization, Plaintiff informed the treating physician that he believed his wound was caused by "step[ping] on something with his right foot while barefoot approximately 2 weeks ago," and that he "had been walking barefoot" before his wound manifested. ECF No. 82 at 191–192. Defendants, for their part, point to other potential causes of the infection, including that Plaintiff soaked his right foot in the toilet. *See* ECF No. 84-2 ¶¶ 51, 70; ECF No. 84-1 at 15–16. Defendants also describe his choice to walk barefoot as voluntary, especially where he had access to other assistive devices. ECF No. 84-1 at 13–15.

Resolution of this question is better left for a factfinder, and the Court concludes that Plaintiff raises a genuine question of whether the delay in specialty footwear led to the development of a painful infection, so as to satisfy the objective component. Thus, the Court proceeds to examine whether there are triable issues of fact as to the subjective component of an Eighth Amendment violation.

15

### 2. Subjective Component

On the record before the Court, no reasonable jury could find that any Defendant acted "with a sufficiently culpable state of mind" to establish an Eighth Amendment violation. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111 (2d Cir. 2023).

The state of mind required "need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* This is "a mental state equivalent to subjective recklessness, as the term is used in criminal law," and "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* "[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." *Id.*

As a result, "mere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Chance*, 143 F.3d at 703 (internal quotation marks and citation omitted). Further, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*

#### a. Dr. Feder

Based on the evidence in the record, no reasonable jury could find that Dr. Feder had the requisite state of mind to establish deliberate indifference for several reasons.

First, the undisputed record evidence demonstrates that Dr. Feder was not involved in any early denial of specialty footwear, and that instead she became involved in the discussion about his footwear only after Plaintiff's hospitalization in early June.

For this question, a recap of the record as to Dr. Feder is prudent.  The May 14, 2020, intake form completed by an examining nurse indicates that Plaintiff was observed as having a limp and "reports orthotic shoe."  ECF No. 82 at 377.  During that examination, Plaintiff also reported he was able to walk with a walker but needed a wheelchair for long distances, had a walker pass, and required a "foot wedge."  *Id.* at 358, 374.  Plaintiff received the walker and access to the wheelchair for long distances.  *Id.* at 353, 356–57.  Plaintiff indicated he would request that the foot wedge be brought from his home.  *Id.* at 355.  None of the May 14, 2020, intake forms suggest Dr. Feder's involvement.

Dr. Feder's first appearance in Plaintiff's medical records is on May 18, 2020, when Dr. Feder documented Plaintiff's disability, without examining him.  *Id.* at 331; ECF No. 84-2 ¶ 42. Dr. Feder indicated that Plaintiff was assigned a walker but that he need not be assigned his own wheelchair (and instead could request one for long distances).  ECF No. 84-2 ¶ 33, 42.  Next, on May 24, 2020, Dr. Feder authorized, on a nurse's recommendation, that Plaintiff be prescribed Acetaminophen for his pain.  ECF No. 82 at 308.

On May 27, 2020, Plaintiff informed a different nurse (an APRN) that the Warden approved his footwear, and Plaintiff needed "medical" to order it.  *Id.* at 290.  That nurse noted she would "write [W]arden/secretary [to] inquire about footwear."  *Id.*  She further indicated that she and the Warden assessed his personal footwear and determined that his footwear (Air Force Ones) did not "have special support," such as a shoe insert that would support his needs.  *Id.* at 284.  That nurse further determined that the shoes were comparable to shoes in the commissary,

and "[h]is own shoes may only worsen his current infection." *Id.* There is no mention of Dr. Feder in these notes. This determination—that the Warden and Plaintiff's "provider" disapproved his use of personal shoes because they had no special support—was relayed to Plaintiff on May 29, 2020. *Id.* at 279. Plaintiff was informed that he was to be provided with a brace instead. *Id.*

It is only after his hospitalization in early June that the record shows Plaintiff wrote to Dr. Feder requesting approval of a so-called "sneaker pass." *Id.* at 151. In that correspondence, Plaintiff explained that the Warden told Plaintiff that he would allow him to purchase sneakers from an outside vendor if medical approved it and that he already has a "sneaker pass in [his] medical file," and Plaintiff asked Dr. Feder to approve that pass. *Id.* A nurse replied to Plaintiff on June 15, 2020, to say that Plaintiff did not "have a current sneaker pass" and that there are "plenty of options on commissary" that did not require medical approval. *Id.*

On June 17, 2020, Dr. Feder met with Plaintiff, who again requested specialty footwear. *Id.* at 148. In these notes, Dr. Feder wrote that Plaintiff "needs special [footwear]" created by an outside company, but that was "difficult to do due to COVID-19 restrictions." *Id.* She continued, "[i]n the interim, he tells me, he has spoken to the Warden[,] who said he will be allowed to purchase sneakers via the commissary." *Id.*

On July 6, 2020, Plaintiff again requested approval of a sneaker pass because he was "trying to hobble with [his] walker." *Id.* at 63–64. Dr. Feder saw Plaintiff on July 10, 2020, and, regarding that visit, wrote:

> [Plaintiff] will have to get measured for customized [footwear] from [an outside vendor]. However, this will be a lengthy process. We discussed that he should obtain suitable sneakers via the commissary in Size 13 wide from an outside vendor through the commissary. This will ensure that all specifications required by the DOC for footwear will be met. This footwear will also be obtainable faster than customized [footwear] can be made and will provide some protection for the inmate's feet on the concrete floor.

18

*Id.* at 59.  Dr. Feder approved Plaintiff's sneaker pass to purchase sneakers at the Commissary from an outside vendor, and "for custom fitted shoes once [his right] foot has healed."  *Id.* at 51, 56, 59.

On July 29, 2020, Plaintiff wrote to Dr. Feder, noting that his wound was "99% closed," and he would like to be "fitted for lifts to go in [his] sneakers."  *Id.* at 26.  Dr. Feder responded on July 31, 2020, writing that she was "glad that the wound is finally closing," and "[w]e'll start working on all this."  *Id.*  Plaintiff wrote again on August 4, 2020, to inform Dr. Feder that he used his sneaker pass to order sneakers, but the Commissary was refusing to release them.  *Id.* at 17. Dr. Feder responded the next day, noting that she had asked her manager to investigate the "sneaker problem."  *Id.*  The last relevant notation in the records is Plaintiff writing again to request assistance with his sneakers on August 12, 2020.  *Id.* at 4.

Considering the above record evidence, the Court concludes that no reasonable jury could conclude that Dr. Feder acted with deliberate indifference to Plaintiff's need for specialty sneakers. To start, Plaintiff has pointed to no admissible evidence that Dr. Feder denied Plaintiff a sneaker pass during the period before his hospital admission, which he asserts as the relevant period of time.  *See* ECF No. 89-1 at 15.  Dr. Feder treated Plaintiff only sparingly, and Defendants maintain that Dr. Feder's intermittent care makes sense considering she was employed only part-time with the DOC at that time.  Feder Decl. ¶¶ 3, 16.

Moreover, even if Dr. Feder did deny Plaintiff a sneaker pass before his hospitalization, nothing in the record suggests that that decision reaches the high bar of subjective deliberate indifference.  Dr. Feder attests—and Plaintiff points to no adequate evidence to dispute—that specialty footwear is not always required for persons with Plaintiff's condition, as people with the condition can manage without it.  *Id.* ¶ 21.  And Dr. Feder assigned Plaintiff an assistive walker

on his admission, as a "suitable assistive device for his leg deformity." *Id.* ¶ 28. And in any event, Dr. Feder attests that she "had no ability to guarantee that a patient will receive . . . specialty footwear." *Id.* ¶ 7.

Even when this evidence is viewed in the light most favorable to Plaintiff, no reasonable jury could find that Dr. Feder recklessly ignored Plaintiff's condition, leading to his development of an infection. At best, even assuming (despite the contrary evidence) that she denied him a sneaker pass before his hospitalization, such actions could be characterized as negligence, which is not actionable under the Eighth Amendment. "[M]ere medical malpractice is not tantamount to deliberate indifference." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks and citation omitted). And Plaintiff has produced no evidence to suggest that Dr. Feder ordered Plaintiff a walker rather than specialty footwear for reasons other than "sound medical judgment." *See Chance*, 143 F.3d at 704 (holding that treatment prescribed for ulterior motives may show deliberate indifference).

This, compounded with the unrebutted evidence showing that Dr. Feder was not involved in the discussions regarding Plaintiff's sneaker pass before his surgery, compels the conclusion that no reasonable jury could find that Dr. Feder's conduct amounted to deliberate indifference. The Court thus grants summary judgment to Dr. Feder on Plaintiff's Eighth Amendment claim against her.

b.   Defendants Marceau, Bellman, and Fernandez:

The Court reaches the same conclusion with respect to Plaintiff's claims against Marceau, Bellman, and Fernandez related to what Plaintiff describes as delayed treatment of his abscess, which can be analyzed together.

Again, revisiting the record as to these Defendants assists the Court's analysis. Bellman conducted part of Plaintiff's health evaluation during intake on May 14, 2020. ECF No. 82 at 364. On May 23, 2020, Bellman again evaluated Plaintiff, and this time she noted alteration of the "integrity" of his skin on his right foot. *Id.* at 310. The notes reflect that Plaintiff indicated he had pain related to his right foot, and Bellman noted "[c]ontinue to monitor per protocol." *Id.* Bellman evaluated Plaintiff the next day, too. *Id.* at 305. On this date, she noted Plaintiff was "moaning throughout shift," and that she administered his prescribed Acetaminophen. *Id.* (cleaned up).

The notes indicate that Fernandez saw Plaintiff on May 25, 2020, when the condition of Plaintiff's right foot appeared to be deteriorating. *Id.* at 299. Fernandez indicated Plaintiff's right foot appeared "significantly dry and cracking," swollen, and causing pain. *Id.* Fernandez cleansed the foot, applied Bacitracin, and noted that a provider needed to see Plaintiff. *Id.*

On May 27, 2020, Bellman evaluated Plaintiff's right foot, which was bleeding, and changed his wound dressings. *Id.* at 281–83. She left him with additional wound dressings and informed him that he should contact medical if he needed additional treatment. *Id.* at 281. A different nurse met with Plaintiff that day and ordered an x-ray of his right foot. *Id.* at 288, 290–92. The x-ray was taken that day and revealed an abscess on his right foot. *Id.* at 288. Fernandez took his vitals, and Bellman ordered him a brace for his foot. *Id.* at 280, 287.

On May 29, 2020, Marceau observed Plaintiff's right foot as having an open wound and being swollen and hot to the touch. *Id.* at 229. The notes indicate that she assessed him to have an infection, and, per a separate doctor's orders, that he should be admitted to the infirmary for treatment. *Id.* Plaintiff was admitted to the infirmary that day for "infection, altered skin integrity." *Id.* at 267. Bellman evaluated Plaintiff on admission. *Id.* at 262–64, 267. Plaintiff's right foot showed signs of infection, including "bleeding, . . . pus, moist, hot, swollen." *Id.* at 262,

268.  He was given intravenous antibiotics and pain medication.  *Id.* at 262, 270.  The condition of his right foot worsened still, and a different doctor and nurse observed signs of infection.  *Id.* at 273–277.  Plaintiff was given intravenous antibiotics.  *Id.* at 271.

Plaintiff continued his treatment in the infirmary through May 31, 2020, and his condition appeared, per the notes, to be continuously managed—though the abscess became more painful. *Id.* at 239 (note from non-party nurse indicating abscess became too painful to drain), 240–257. From May 30, 2020, until June 1, 2020, the notes do not reflect that Plaintiff interacted with any of the named Defendants.

On June 1, 2020, the notes describe Plaintiff's wound as "painful" with "bloody drainage." *Id.* at 232–235.  He was transferred to the emergency department at the UConn hospital that day. *Id.* at 218–227.  His abscess was removed in the hospital, and he returned to Corrigan on June 4, 2020.  *Id.* at 192, 210, 213, 215.

In his opposition, Plaintiff generally argues that Marceau, Bellman, and Fernandez acted with deliberate indifference in initially treating Plaintiff's wound with only over-the-counter medication.  ECF No. 89-1 at 11–12, 15.  He also claims he received no care while on BOS.  *Id.* at 15.  Marceau, Bellman, and Fernandez respond that they had only limited involvement in Plaintiff's treatment, and no involvement at all in the decision-making of Plaintiff's prescribed course of treatment.  ECF No. 84-1 at 12, 19.  Marceau, Bellman, and Fernandez also maintain that they provided Plaintiff care within the appropriate and reasonable practices of a nurse, including addressing his pain when appropriate.  ECF No. 84-2 ¶¶ 115–18.

Considering the record evidence described above, the Court agrees that the record reflects that Defendants Marceau, Bellman, and Fernandez had only limited involvement during the relevant time.  More critically, though, even viewed in the light most favorable to Plaintiff, there

22

is insufficient evidence from which a jury could reasonably find that Marceau, Bellman, and Fernandez ignored Plaintiff's complaints and thus acted with deliberate indifference. Plaintiff's opposition argues generally that he disagreed with his course of treatment, and that medical professionals at large ignored his complaints. But no record evidence supports that *these* Defendants ignored Plaintiff and, in any event, "[m]ere disagreement over the proper course of treatment is not sufficient." *Faraday v. Lantz*, No. 3:03-CV-1520 (SRU), 2005 WL 3465846, at \*5 (D. Conn. Dec. 12, 2005); *see also Chance*, 143 F.3d at 703; *Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (summary order) (citing *Chance*).

The Court concludes that no reasonable jury could find that these Defendants acted with deliberate indifference in the treatment of Plaintiff's wound. The Court therefore grants summary judgment in Marceau, Bellman, and Fernandez's favor, as well.

B. Qualified Immunity

Defendants separately argue they are entitled to qualified immunity, which would provide an independent basis for granting summary judgment for Defendants. Considering its holdings above that Defendants must be granted summary judgment for other reasons, the Court does not reach Defendants' qualified immunity arguments.

## IV.    CONCLUSION

For the reasons described herein, Defendants' motion for summary judgment, ECF No. 84, is **GRANTED**.  The Clerk of Court is directed to enter judgment for Defendants and close this case.

**SO ORDERED** at Hartford, Connecticut, this 16th day of March, 2026.


   /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE